# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DONALD E. SMITH,**

           **Petitioner,**

**v.**

**MICHAEL SHEETS, Warden,**

      **Respondent.**

**CASE NO. 2:08-cv-776**
**JUDGE SMITH**
**MAGISTRATE JUDGE ABEL**

## Order
### and
## Report and Recommendation

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant amended petition, respondent's return of writ and supplemental responses, petitioner's traverse and supplemental responses, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**. Respondent's motion to strike the filing of petitioner's amended petition, Doc. No. 21, is **DENIED**. Petitioner's request for an evidentiary hearing is also **DENIED**.

### Respondent's Motion to Strike the Amended Petition

On May 27, 2009, the Court granted petitioner's unopposed request to amend his petition to include a claim that the trial court's re-sentencing violated due process and the Ex Post Facto Clause and directed respondent to file a supplemental response regarding this claim. *See* Doc. No. 14. Petitioner subsequently filed an amended petition. *See* Doc. No. 21. Respondent requests that petitioner's amended petition therefore

be stricken, on the grounds that Smith failed to file a motion for leave to amend his petition and that he expanded his re-sentencing claim.  *See* Doc. No. 23.  However, the pleadings of *pro se* prisoners must be liberally construed.  *Haines v. Kerner*, 404 U.S. 519, 595-96 (1972).  Further, the Court has already granted petitioner's unopposed request to amend his petition to include a claim that his sentence was improperly imposed.  In any event, as noted by respondent, for the reasons that follow, all of petitioner's allegations regarding the trial court's re-sentencing are procedurally defaulted.  Accordingly, respondent's motion to strike petitioner's amended petition, Doc. No. 23, is **DENIED.**

### Facts and Procedural History

The Ohio Fourth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On November 5, 2004, the Pickaway County Grand Jury indicted Smith for one count of illegal use of a minor in nudity-oriented material in violation of R.C. 2907.03(A)(1), a felony of the second degree, in Pickaway County Case No.2004-CR-234. Subsequently, in Case No.2004-CR-253, the Pickaway County Grand Jury indicted Smith for aggravated burglary, in violation of R.C. 2911.11(A)(2), a felony of the first degree; four counts of kidnapping, in violation of R.C. 2905.01(B)(2), felonies of the first degree; felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree; and abduction, in violation of R.C. 2905.02(A)(2), a felony of the third degree. Smith pled not guilty to all of the charges against him. The matter proceeded to a jury trial on all charges on December 12, 2005.
>
> The trial testimony revealed that at the time of the September 18, 2004, incident underlying the charge of illegal use of minor in nudity-oriented material, Smith resided with his girlfriend, Cristi Hankins, and their three young sons in the

home of Cristi's mother and step-father, Robert and Cynthia Smith.FN2 Cristi's younger sister also resided in the home.

FN2. Although Robert and Cynthia share a common last name with Smith, the record reflects that they are not related to him by blood or marriage.

The illegal use of a minor in nudity-oriented material charge arose out of an incident where Cristi's younger sister discovered a video camera, which she recognized as Smith's, concealed in a pile of dirty clothes on the bathroom floor in her family's home. She noticed the camera lens, protruding from the pile of clothes and pointed directly at the toilet and shower area of the bathroom, as she used the toilet. When she removed the camera from its hiding place, she discovered that it was recording. After rewinding the tape a bit, she discovered that it recorded her using the toilet. Upset, she opened the camera and tore up the tape. She called her mother at work to tell her what happened. Robert returned to the home and reported the incident to the Ashville Police Department.

After that incident, Robert asked Smith to leave the family's home. Smith then went to live with his sister in Hilliard, Ohio. Cristi and the boys also left to live with Smith at his sister's home for approximately two weeks.

On October 4, 2004, Smith and Cristi left the boys in daycare, and left the childrens' car seats, formula, and diapers at Smith's mother's house, along with a note indicating that they were abandoning their sons. The two headed for Texas. Cristi testified that Smith took her against her will, and threatened to kill her or the children if she told anyone. But, Smith testified that she willingly left with him.

On November 27, 2004, a third incident occurred at the Smith family home, forming the basis of Smith's aggravated burglary, kidnapping, and felonious assault charges. Robert testified that, on that date, he awoke to the sound of shattering glass. He went downstairs to discover that the side door glass was shattered, and the door was partially opened. He then heard Cynthia screaming upstairs. As he started up the stairs,

Cynthia came down the stairs with Smith behind her. Smith had a twelve-inch kitchen knife, and said he wanted to have a family meeting about the earlier incidents. Robert asked Smith to put down the knife and leave the house, but Smith wanted to go upstairs. Robert testified that Smith told them that someone would get hurt if anybody called the cops.

After about ten minutes, the three of them headed upstairs, where Robert knocked on Cristi's door and asked her to open it. Smith then kicked in the door, grabbed Cristi, holding the knife to her stomach. He then backed up, forcing Cristi's younger sister to retreat into the closet.

Cynthia testified that the first thing she remembered was Robert getting out of bed and going downstairs to investigate the shattering noise that awakened him. She started to go down the stairs behind him, but decided to check on the two older boys in their room. She found Smith outside their bedroom. Cyntia saw Smith had a knife and started screaming. She then ran down the stairs, followed by Smith, and came to Robert. She headed toward the kitchen and picked up the phone, but the line was dead. Smith told her that he cut the line. Cynthia testified that Smith wanted to have a family talk about the videotape, and that he kept trying to get them to go back upstairs with him. She told him that he needed to leave. He kept saying "come on, come on" and gesturing toward the steps with the knife. Cynthia reported that Smith kept saying that nobody would get hurt unless the cops were called, but that if the cops were called, somebody was going to get hurt.

Cynthia testified that she and Robert went back upstairs with Smith. She recalled Robert knocking on Cristi's door, and Cristi asking if he was alone. She indicated that when Smith saw the police lights through the blinds, he kicked in the bedroom door. She saw him go after Cristi, and stated that Cristi was screaming and running. As Smith went after Cristi, Cynthia heard pounding and ran down the stairs to let the police into the house. By the time she got back upstairs, the police had Smith on the ground.

Cristi's younger sister testified that she awoke to the sound of glass shattering. She indicated that she got up and heard her mother say, "Oh, my god, Donnie, don't[,]" and then heard her mother scream. She grabbed the phone to call 911, but the line was dead. She got up and went to Cristi's room where she awakened Cristi and told her that Smith was in the house. She testified that Cristi grabbed her cell phone and called 911. The sister then locked the bedroom door, and went to stand by the closet door, while Cristi stood next to the baby's crib. Like Robert and Cynthia, Cristi's sister testified that Robert knocked on the door and told them to open it, and that when Cristi asked if he was alone, he said, "No."

The sister then testified that Smith kicked in the door, grabbed Cristi, and put the knife to her stomach. She indicated that he started backing toward her, and that she started backing as well. She ended up in the closet, and Smith blocked her there, holding Cristi in his arms. Despite Robert's pleas, Smith would not let her out of the closet. The sister testified that Smith kept saying that they were going to have a family meeting, and that no one would get hurt if they did what he said. When asked what he said would happen if they did not have a family meeting or do what he said, the sister testified, "He said he would hurt us."

Cristi testified that her sister woke her up early in the morning, telling her that Smith was in the house. She used her cell phone to call 911. While she spoke with the operator, Robert knocked on the door and asked her to open it. She asked if he was alone, and he replied, "No." Then Smith kicked in the door, rushed into the room yelling, grabbed her, put the knife on her stomach, and pulled her over in front of the closet. She recalled Robert and Smith yelling, but stated that she was "in shock" and could not remember exactly what they said. Cristi testified that Smith was "violent", and "wanted us to listen to him." When asked upon cross-examination how long Smith held her at knifepoint, Cristi estimated, "Probably five, ten minutes. I don't know."

Officer Kevin Elliott of the Ashville Police Department testified that he was the first officer to arrive at the Smith house-

hold on November 27, 2004. Based upon the nature of the call and the information he received from the dispatcher, he requested backup from the South Bloomfield Police Department before he arrived at the scene. He testified that when he arrived at the scene, he could hear the South Bloomfield officers responding to the scene. As he approached the house, he noticed that the mini blind on the second floor was pulled back a little bit, as if somebody was trying to look out. When no one answered the front door, the dispatcher advised him that the suspect was in the residence with a knife. Officer Elliott unsuccessfully attempted to force entry. At that time, Officers David Parlow and James Chapman of the South Bloomfield Police Department arrived, and Officer Chapman forced open the front door.

The officers entered the residence and Officer Elliott proceeded into the kitchen where he noticed the sliding glass door was shattered. The Officers proceeded up the stairs, and Officer Elliott observed a man with a large butcher knife holding a woman. The man had his left arm around her throat, and his right arm around her abdomen. Officer Elliott indicated that all three officers immediately approached the bedroom with their guns drawn, shouting for the man to drop the knife and let the woman go. He testified that it seemed to go on forever, kind of in slow motion, but that it was probably just a matter of seconds until the man, who he later identified as Smith, complied with their demands.

Officer David Parlow responded to the scene on behalf of the South Bloomfield Police Department. He offered testimony substantially similar to that of Officer Elliott. He described the forced entry into the residence, noted that a female resident greeted them at the door and directed them upstairs. He indicated that they made a quick sweep of the downstairs before proceeding upstairs, where they observed a man holding a woman at knifepoint. He testified that Smith had a woman in a "bear hug," with one arm up around her upper chest area, and a large kitchen knife in his hand, pressed into the female's abdomen.

Officers Elliott and Parlow both testified that after they cuffed

Smith, they searched him and discovered a homemade sheath for one of the knives, a roll of duct tape, a plastic bag with various kinds of speaker or electrical wire. Additionally, on the inside of Smith's left leg, they discovered another home-made knife sheath and a black and yellow utility knife.

The jury returned a verdict finding Smith guilty of all charges with the exception of the abduction charge, for which the jury returned a not guilty verdict. The court entered a judgment and sentenced Smith to serve seven years in prison for illegal use of a minor in nudity-oriented material in Case No.2004-CR-234. The court entered a separate judgment for the other offenses in Case No.2004-CR-253, and sentenced Smith to serve: (1) eight years in prison for aggravated burglary; (2) eight years in prison on each of the four kidnapping con-victions; and (3) seven years in prison on the felonious assault conviction. The court ordered Smith to serve his sentences for aggravated burglary and each of the four kidnapping convict-ions concurrent to each other. Additionally, the court ordered him to serve his sentence for felonious assault consecutive to his sentences for aggravated burglary and kidnapping, and consecutive to the sentence it imposed for illegal use of a minor in nudity-oriented material in Case No.2004-CR-234.

Smith appeals, raising the following assignments of error: I. "The trial court erred by refusing to dismiss an indictment that did not allege a crime in violation of Article I, §10 of the Ohio." II. "The trial court violated Donald Smith's right to due process and a fair trial when, in the absence of sufficient evidence, the trial court found him guilty of felonious assault." III. "The trial court violated Donald Smith's rights to due process and a fair trial when it entered a judgment of conviction for felonious assault, which was against the mani-fest weight of the evidence." IV. "The trial court erred by im-posing an illegal sentence."

*State v. Smith*, 2007 WL 357274 (Ohio App. 4th Dist. January 29, 2007). On January 29, 2007, the appellate court sustained petitioner's first assignment of error, reversing and vacating his conviction on illegal use of a minor in nudity oriented material, overruled

7

his second and third assignments of error, affirming his conviction on felonious assault, and sustained his fourth assignment of error, vacating his sentences on aggravated burglary, kidnapping, and felonious assault, remanding the case to the trial court for resentencing. *Id.* On June 6, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Smith*, 114 Ohio St.3d 1413 (2007).

On March 20, 2008, the trial court re-imposed the same sentences. Petitioner filed a timely appeal, in which he asserted as follows:

> "Did the trial court commit prejudicial error in the sentences imposed?"
>
> Smith gives four reasons why the trial court improperly imposed his sentences: (1) he was entitled to a presumption of minimum, concurrent sentences; (2) his sentences violated the Due Process and Ex Post Facto clauses; (3) the trial court abused its discretion; and (4) the trial court failed to make the requisite findings.

*State v. Smith*, 2009 WL 389866 (Ohio App. 4th Dist. February 13, 2009). On February 13, 2009, the appellate court affirmed the trial court's judgment. *Id.* Petitioner did not file a timely appeal. On June 18, 2009, Smith filed a motion for delayed appeal to the Ohio Supreme Court. On July 29, 2009, the Ohio Supreme Court denied his motion for delayed appeal and dismissed the appeal. *State v. Smith*, 122 Ohio St.3d 1476 (2009).

On September 2, 2008, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. On August 24, 2009, he filed an amended petition. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

1. The trial court erred by finding petitioner guilty of felonious assault in the absence of sufficient evidence thereby violating his constitutional rights.

2. The trial court committed prejudicial error in the sentences it imposed.

It is the position of the respondent that claim one is without merit and claim two is procedurally defaulted.

## Claim One

In claim one, petitioner asserts that the evidence was constitutionally insufficient to sustain his conviction on felonious assault. The state appellate court rejected this clam as follows:

Smith contends that the state failed to present sufficient evidence to support his conviction for felonious assault, because the state did not present evidence to establish the element of "cause or attempt to cause physical harm." Specifically, Smith contends that because the record demonstrates that, even though he had the opportunity to do so for at least five minutes, he did not actually hurt Cristi.

In reviewing a case to determine whether the record contains sufficient evidence to support a criminal conviction, our function "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. See, also, *Jackson v. Virginia* (1979), 443 U.S. 307, 319.

This test raises a question of law and does not allow us to weigh the evidence. *State v. Martin* (1983), 20 Ohio App.3d

172, 175. Rather, the test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319. We reserve the issues of the weight given to the evidence and the credibility of witnesses for the trier of fact. *State v. Thomas* (1982), 70 Ohio St.2d 79, 79-80; *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.

R.C. 2903.11 defines the offense of felonious assault. It provides, in relevant part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).

In *State v. Brooks* (1989), 44 Ohio St.3d 185, the Ohio Supreme Court, considered whether the act of pointing a gun at someone, without additional evidence of the actor's intention, would be sufficient to support a conviction for felonious assault. The Court concluded that while the act of pointing a deadly weapon at someone would justify a jury's conclusion that the accused committed aggravated menacing, in violation of R.C. 2903.21, the pointing of a deadly weapon at another, alone, is an equivocal indicator of the accused's intention to cause physical harm by use of that weapon. *Id.* at 192. However, the Court went on to find that the record contained sufficient evidence to support a conviction for felonious assault where testimony revealed that the defendant and the victim "became embroiled in a volatile argument [,]" and that "the defendant suddenly drew a revolver and angrily told [the victim] that he would kill her." *Id.*

The Court later elaborated upon its ruling in *Brooks,* holding that "The act of pointing a deadly weapon at another coupled with a threat, which indicates an intention to use such weapon, is sufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2)." *State v. Green* (1991), 58 Ohio St.3d 239, syllabus.

Here, Smith does not dispute that he held a twelve-inch knife to Cristi's abdomen or that he threatened to cause her bodily

injury. In fact, he concedes that the record contained "substantial evidence" that he held a knife to her abdomen and threatened to cause bodily injury. However, Smith contends that his failure to act upon his threat during the five minutes he held Cristi at knifepoint rebuts the inference that he was attempting to cause her physical injury. We believe that Smith's argument that the length of time he held Cristi at knifepoint without actually causing her physical harm goes to the weight of the evidence, rather than the sufficiency of the evidence. Therefore, we shall address it in the context of Smith's third assignment of error below.

In light of the Ohio Supreme Court's holdings in *Brooks* and *Green*, supra, we conclude that Smith's holding Cristi at knifepoint, coupled with his repeated threats to cause bodily harm constitute sufficient evidence from which a rational trier of fact could conclude, beyond a reasonable doubt, that Smith committed felonious assault. Accordingly, we overrule Smith's second assignment of error.

*State v. Smith, supra*, 2007 WL 357274.

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. §2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was

contrary to or an unreasonable application of clearly established federal law, or based on

an unreasonable determination of the facts in light of the evidence that was presented.

28 U.S.C. §2254(d) provides:

An application for a writ of habeas corpus on behalf of a

person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States District Court for the Western District of Michigan has summarized this standard as follows:

[A] decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state court's adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* Further, the federal habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.*

*Williams v. Lavigne*, 2006 WL 2524220 (W.D. Michigan August 30, 2006), citing *Williams v. Taylor*, 529 U.S. 362 (2000).  Petitioner has failed to meet this standard here.

To the extent that petitioner asserts that his convictions are against the manifest

12

weight of the evidence fails to present an issue appropriate for federal habeas corpus review. The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses. *Jackson*, 443 U.S. at 319; *Walker*, 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to act as a "thirteenth juror" and review the entire record, weight the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the

evidence cannot be considered by this Court.

Petitioner does assert that the evidence was constitutionally insufficient to sustain his conviction on felonious assault. Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra,* 443 U.S. ta 319. To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West,* 505 U.S. 277, 296 (1992) (citing *Jackson,* at 319.) The prosecution is not affirmatively required to "rule out every hypothesis except that of guilty." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume-even if it does not appear on the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id.* (quoting *Jackson,* at 326).

Petitioner contends that the evidence was constitutionally insufficient to sustain his conviction on felonious assault, because there was no evidence that he actually harmed the alleged victim, even though he had the opportunity to do so. Petitioner states that he only wanted to talk to her, and points out that, upon arrival of the police, he immediately cooperated with them. *See* Doc. No. 12. However, the jury rejected that argument, and there was evidence presented to them to support that finding beyond a reasonable doubt. For the reasons discussed by the state appellate court, the Magistrate Judge concludes that, when viewing all of the evidence in the light most favorable to the

14

prosecution, *see Jackson v. Virginia, supra,* the evidence was constitutionally sufficient to sustain petitioner's conviction.

## Procedural Default: Claim Two

Respondent contends that petitioner's second claim, that the trial court committed a prejudicial sentencing error, was procedurally defaulted in the Ohio courts. In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier,* 447 U.S. 478, 485 (1986); *Engle v. Issac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's

claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir.1985).

In claim two, petitioner asserts that the trial court's re-sentencing violated due process and the Ex Post Facto Clause and was otherwise unconstitutionally or improperly imposed. This claim, being readily apparent from the face of the record, was properly raised on direct appeal; however, petitioner failed to file a timely appeal of the appellate court's February 13, 2009, decision denying this claim to the Ohio Supreme Court. Instead, on June 18, 2009, he filed a motion for delayed appeal. *See Exhibits A and B to Respondent's Surreply*, Doc. No. 24. The Ohio Supreme Court denied petitioner's motion for delayed appeal. *Exhibit C to Respondent's Surreply*. Therefore, petitioner's claims regarding his re-sentencing are waived. *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004).

As cause for his procedural default, petitioner asserts that his attorney failed to

16

timely notify him of the appellate court's February 13, 2009, decision denying his claim, and that he did not receive notification of the appellate court's decision until April 20, 2009. *See Petitioner's Reply*, Doc. No. 26; *Exhibit B to Respondent's Surreply*, Doc. No. 24 . Petitioner states that, on April 28, 2009, he then wrote to the Ohio Public Defender seeking advice regarding the filing of his motion for delayed appeal in the Ohio Supreme Court. *See id.* On May 14, 2009, the public defender "supplied [petitioner] with a packet of information" regarding the filing of his motion for delayed appeal. *Id.*, at 2. Petitioner researched the issue and filed motion approximately one month later, on June 18, 2009. *See id.* Petitioner has attached a letter from the Office of the Ohio Public Defender dated May 14, 2009, which indicates:

> I understand that your appellate attorney did not inform you of the decision of the Court of Appeals affirming the judgment of conviction and sentence until the time for filing a notice of appeal to the Ohio Supreme Court had passed. I enclose a packet you may use to file a Motion for Leave to Appeal to the Ohio Supreme Court on your own behalf.

*Exhibit 1 to Petitioner's Reply*, Doc. No. 26.

According to petitioner, he has established cause for his procedural default, because he filed his motion for delayed appeal on June 18, 2009, and within 45 days after receiving advise from the Office of the Public Defender, on May 14, 2009. *See Petitioner's Reply*.

In *Smith v. Ohio Department of Rehabilitation and Correction*, 463 F.3d 426, 432-33 (6th Cir. 2006), the United States Court of Appeals for the Sixth Circuit held that an attorney's

failure to timely notify his client of the Court of Appeals' decision may constitute cause

for his failure to file a timely appeal with the Ohio Supreme Court:

> There is no doubt that there is a constitutional right to effective assistance of counsel during a direct appeal as of right, *see, e.g.,* *Smith v. Robbins*, 528 U.S. 259, 275-76, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir.2005), the stage of the proceedings at which Smith claims that his lawyer failed, and that appellate counsel's duties do not terminate the moment the court of appeals hands down its decision. "Because a defendant is entitled to effective assistance of counsel on direct appeal, such an individual must be accorded effective assistance of counsel throughout *all* phases of that stage of the criminal proceedings."*White v. Schotten*, 201 F.3d 743, 752-53 (6th Cir.2000) (citation omitted), *overruled on other grounds by Lopez*, 426 F.3d at 341. The court's ultimate decision regarding a particular legal proceeding is *part of that legal proceeding,* and appointed counsel's duties in representing a client during that legal proceeding include the duty of informing her client of the outcome of the proceeding. *See Paris v. Turner*, No. 97-4129, 1999 WL 357815, at *2-*3 (6th Cir. May 26, 1999) (unpublished opinion) (holding in part that due to counsel's delay in informing defendant of the decision on his first appeal of right and counsel's "fail[ure] to communicate to his client how to proceed with further appeals," it cannot "fairly be said that [the defendant] truly had his first appeal of right"), *cert. denied,* 529 U.S. 1104, 120 S.Ct. 1846, 146 L.Ed.2d 788 (2000). The Constitution requires "that counsel make objectively reasonable choices," and must do so not only *during* the legal proceeding for which the counsel represents the client, but also *after* the judicial proceeding has concluded in determining whether an appeal should be filed. *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). The Supreme Court has applied this standard to hold that trial counsel has a constitutional duty to consult with clients about filing an appeal after the trial proceedings have concluded "when there is reason to think either (1) that a rational defendant would want to appeal ..., or (2) that this particular defendant reasonably demonstrated to counsel that he was

interested in appealing." *Id*. at 480, 120 S.Ct. 1029 (expecting that lower courts will find that "in the vast majority of cases … counsel had a duty to consult with the defendant about an appeal,"id. at 481, 120 S.Ct. 1029).

"From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and *to keep the defendant informed of important developments in the course of the prosecution*." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052 (emphasis added). Because the decision regarding whether to "take an appeal" is a "fundamental decision[ ]" that "the accused has the ultimate authority to make," *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), counsel has a duty to inform the accused of the resolution of a proceeding in a timely fashion so that the accused retains his control over the decision to appeal. Local Rule 9(B) of the Ohio Court of Appeals for the Ninth District, the court that issued the decision at issue, states that "[t]he clerk of court for each county shall mail copies of journal entries, court notices, and the final decision and journal entry to counsel of record for a party to the appeal at the last known business address of counsel as listed in the court of appeals' records." The only way that Smith could have learned of the unpublished decision of the Ohio Court of Appeals affirming his conviction was if his counsel notified him. When she failed to do so, Smith was without any means of notice of the decision and thus did not and could not know that the forty-five day deadline for filing a notice of appeal to the Ohio Supreme Court had started to run…. Because there was no conceivable benefit to delaying notice to Smith of the Ohio Court of Appeals decision, similar to a counsel's failure to file an appeal after specifically being instructed to do so by her client, the conduct of Smith's counsel "cannot be considered a strategic decision."*Flores-Ortega*, 528 U.S. at 477, 120 S.Ct. 1029 (citing *Rodriquez v. United States*, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969), and *Peguero v. United States*, 526 U.S. 23, 28, 119 S.Ct. 961, 143 L.Ed.2d 18 (1999)). For these reasons, the failure of Smith's counsel to inform Smith of the decision of the Ohio Court of Appeals affirming his conviction within days of the deadline for filing of the appeal

> cannot be deemed "objectively reasonable," and thus con-
> stitutes constitutionally deficient performance.

*Id*. However, in order to establish prejudice, "the defendant must demonstrate that

counsel's deficient performance 'actually cause[d] the forfeiture of the defendant's

appeal.'" *Id*., quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000). Therefore, petitioner

must establish that, but for his attorney's failure to timely notify him of the appellate

court's decision, he would have timely appealed to the Ohio Supreme Court. *Id*.

> In assessing whether a defendant ..."would have timely
> appealed," ... we apply a rebuttable presumption that if the
> period of time between when the defendant learned of the
> decision and when he or she attempted to appeal the decision
> is *greater* than the period allotted by state law for the timely
> filing of an appeal-here, forty-five days-the defendant fails to
> demonstrate that he or she "would have timely appealed" the
> decision but for the counsel's deficient failure to notify the
> defendant of the decision. In the absence of other circum-
> stances hindering the defendant's ability to attempt to appeal
> the decision within this time frame, allowing a greater
> amount of time would generally bestow a windfall upon the
> defendant whose counsel promptly failed to notify the
> defendant of a decision.

*Id*., at 435.

Here, by petitioner's own account, he learned of the appellate court's decision

denying his appeal on April 20, 2009; however, he waited 59 days, until June 18, 2009, to

file his motion for delayed appeal.[1] *See Petitioner's Reply*, Doc. No. 26. Therefore,

petitioner has failed to establish cause and prejudice for his procedural default. *See*

---

[1] Petitioner indicates that he mailed his appeal on June 15, 2009, 56 days after he
received notification of the appellate court's decision denying his appeal. *See Exhibit A
to Respondent's Surreply.*

*Smith v. Ohio Department of Rehabilitation and Correction, supra; Strickland v. Wilson*, 2009 WL 1617736 *5-6 (N.D. Ohio June 9, 2009)(same).

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333. Petitioner has failed to meet this standard here.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

Respondent's motion to strike the filing of petitioner's amended petition, Doc. No. 21, is **DENIED.** Petitioner's request for an evidentiary hearing is **DENIED.**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report*

*and Recommendation de novo*, and also operates as a waiver of the right to appeal the

decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*,

474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse

decision, they may submit arguments in any objections filed, regarding whether a

certificate of appealability should issue.


s/Mark R. Abel
United States Magistrate Judge